UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| JOHN BRAINARD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 14-110-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| LIBERTY LIFE ASSURANCE | ) | **MEMORANDUM OPINION** |
| COMPANY OF BOSTON, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

This matter is pending for consideration of Plaintiff John Brainard's motion for judgment. [Record No. 40] Pursuant to 29 U.S.C. § 1132(a)(1)(B), Brainard challenges the defendant's denial of his claim for long-term disability ("LTD") benefits under an employee benefit program sponsored by his former employer, Community Trust Bancorp, Inc. The record does not clearly indicate that Brainard is entitled to benefits. Therefore, his motion for judgment will be denied. However, the defendant's decision to deny him benefits was arbitrary and capricious. As a result, the Court will remand the matter back to the plan administrator for a full and fair review.

**I.**

From 1996 to 2011, Brainard worked as a branch manager at Community Trust Bank in Somerset, Kentucky. [*See* Administrative Record, p. 893; hereinafter, "Adm. Rec."] At all relevant times, Brainard was covered under the bank's group LTD plan ("the Plan") governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. Defendant Liberty Life Assurance Company of Boston ("Liberty") provides

-1-

LTD coverage to Community Trust Bank in addition to administering the Plan. This requires Liberty to act in a dual role. The Plan also delegates to Liberty the discretion to make benefit determinations and interpret the terms of the Plan. [Adm. Rec., p. 39]

> According to the Plan,
>
> i. 'Disability' or 'Disabled' means that during the Elimination Period and the next 24 months of Disability you, as a result of Injury or Sickness, are unable to perform the Material and Substantial Duties of your Own Occupations; and
>
> ii. thereafter, you are unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation."

[Adm. Rec., p. 8] The Plan defines "Own Occupation" as "the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy." [Adm. Rec., p. 12]

Brainard reports that he began experiencing neck and back pain in 1989 after he was injured in an automobile accident. [Record No. 40-1, p. 2; Adm. Rec., pp. 61, 155, 616] Brainard claims that the pain worsened during his period of employment with the bank. According to Brainard, combined with depression and the side effects of medication, the pain left him unable to perform his job. On September 16, 2011, Brainard stopped working at the bank and filed a claim for LTD benefits with Liberty. [Adm. Rec., p. 893] Brainard received LTD benefits from September 16, 2011, until May 8, 2012, when Liberty informed him that he no longer qualified for disability benefits under the Plan. [Adm. Rec., p. 734] Brainard subsequently appealed the denial and submitted additional medical documentation. [Adm. Rec., p. 258]

On March 14, 2013, Liberty reinstated Brainard's LTD benefits. [Adm. Rec., p. 53] Liberty then requested that psychiatrist Dr. Sanjay Chandragiri review of Brainard's medical records. [Adm. Rec., pp. 166-69] Following this review, Dr. Chandarigi determined that the medical record did not contained psychiatric diagnoses. *Id.*

Liberty next required Brainard to undergo an independent medical evaluation performed by Dr. Ellen Ballard. [Adm. Rec., pp. 155-159] Based on her physical examination and a review of Brainard's medical records, Dr. Ballard reached a diagnosis of degenerative disc disease. She concluded that Brainard should not lift more than fifteen pounds and also avoid constant cervical motion. [Adm. Rec., p. 158] However, she opined that,

> [Brainard] would be capable of light physical activity, if not moderate physical activity, as I am unable to explain the severity of [his] symptoms based on the records and testing to date. If he is having to use large quantities of pain medication to treat his pain then this could affect his ability to work, but he is not doing that at the present time.

[Adm. Rec., p. 159]

Liberty sldo requested an updated Occupational Analysis/Vocational Review. In the first Occupational Analysis, Liberty's vocational specialist determined that Brainard's occupation as a branch manager "is most often performed at the light to medium level of physical demand." [Adm. Rec., p. 883] Based on subsequent changes to the Dictionary of Occupational Titles, the second Occupational Analysis concluded that the branch manager position "is performed at the sedentary and light level of physical demand with sufficient opportunity at both levels of exertion." [Adm. Rec., p. 152] According to the updated Occupational Analysis, sedentary work only requires occasional exertion of up to ten pounds of force. [Adm. Rec., p. 151]

Relying on the opinions of Dr. Ballard, Dr. Chandragiri, and its vocational specialist, Liberty again concluded that Brainard was not eligible for LTD benefits beyond July 19, 2013. [Adm. Rec., pp. 145-48] Brainard appealed this denial of benefits and submitted additional medical records along with a letter from Dr. Jeffery Golden, his primary care physician. [Adm. Rec., pp. 105, 113-14] Dr. Golden wrote that "John Brainard is a long term patient of mine who suffers from intractable neck and back pain." [Adm. Rec., p. 113] Dr. Golden explained that, at the time of Dr. Ballard's review, Brainard had been able to wean himself off of pain medication for a short time, but was currently taking a daily dose of the medication. *Id.* Dr. Golden predicted that Brainard would always require some narcotic pain medications which causes fatigue as well as memory and concentration problems. *Id.* In Dr. Golden's opinion, "[Brainard] could not function well as a loan officer or bank executive if he is having problems with concentration and memory or if he is distracted by fairly severe pain." *Id.* Dr. Golden further observed that Brainard experienced "labile moods and depressive symptoms related to his chronic pain" that contribute to his disability. [Adm. Rec., p. 114] Finally, he concluded that "[n]othing changed with regard to his health or long term prognosis during the past 4 months that justified revoking his benefits." *Id.*

By letter dated March 17, 2014, Liberty denied Brainard's appeal and advised him that he was still ineligible for benefits as of July 19, 2013. [Adm. Rec., pp. 63-66] In support of this decision, Liberty again relied on the reports of Dr. Chandragiri, Dr. Ballard, and the vocational expert. [Adm. Rec., p. 64] Additionally, Liberty considered another file review performed by Dr. Howard Grattan, who found that Brainard's subjective complaints of pain were not supported by the record. [Adm. Rec., p. 65] Liberty explained that, based on its review, Brainard was capable of performing the material and substantial duties of his

branch manager position, disqualifying him from receiving LTD benefits under the Plan. [Adm. Rec., p. 66]

Having exhausting the appeal process, Brainard filed a Complaint in this Court on May 14, 2014, seeking review of Liberty's decision to deny him LTD benefits. [Record No. 1] Brainard now claims that he is entitled to judgment because Liberty acted arbitrarily and capriciously by denying him those benefits. [Record No. 40-1]

## II.

### A. Standard of Review

ERISA itself does not specify a standard of review. Generally, a challenge to a denial of benefits under the act is reviewed *de novo*. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). However, if the plan at issue grants the plan administrator discretion to determine benefit eligibility, the Court will uphold the plan administrator's determination unless it is arbitrary or capricious. *Id.* Here, the Plan grants such discretion to Liberty. Further, the parties have stipulated that an arbitrary and capricious standard should be applied to Liberty's denial of LTD benefits. [Record No. 28]

The arbitrary and capricious standard is the "least demanding form of judicial review." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011) (internal quotation marks omitted). When it is possible to offer a reasoned explanation for a particular outcome based on substantial evidence, that outcome is not arbitrary or capricious. *Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006).

Substantial evidence is evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). However, the substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (citations and internal quotation marks omitted). If supported by substantial evidence, the administrator's decision must be affirmed, even if the Court would decide the case differently and even if the plaintiff's position is also supported by substantial evidence. *See Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 555 (6th Cir. 1995); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989).

While the arbitrary and capricious standard is highly deferential, it "does not require [the court] merely to rubber stamp the administrator's decision." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)). Rather, the Court reviews "the quality and quantity of the medical evidence on both sides of the issue" to determine whether the administrator's decision was arbitrary and capricious. *Id.* (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).

B.   **Conflict of Interest**

When a plan like the one in this case authorizes the administrator "to decide whether an employee is eligible for benefits and to pay those benefits," an apparent conflict of interest exists. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (internal citation omitted). Courts must consider a conflict of interest as a factor when determining whether a plan administrator's decision was arbitrary or capricious. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292-93 (6th Cir. 2006). However, a conflict of interest does not alter the applicable standard of review. *See Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006); *see also Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311-12 (6th Cir. 2010). Instead, it is simply one consideration that the Court weighs in the review process. *Smith*, 450 F.3d at 260.

In evaluating a conflict, the Court must "look[] to see if there is evidence that the conflict in any way influenced the plan administrator's decision." *Evans*, 434 F.3d at 876. The burden is on the plaintiff to demonstrate any such influence. *Smith,* 450 F.3d at 260. Because Liberty funds the plan and determines eligibility for benefits under it, Liberty does not contest that an apparent conflict exists. [Record No. 42, p. 37]

Brainard argues that an actual conflict influenced Liberty's decision to deny him benefits. For support, he points to Liberty's history of denying him benefits, reinstating those benefits, and then denying them again. [Record No. 40-1, p. 15] After reinstating his benefits, Liberty requested surveillance and numerous independent medical reviews. *Id.* at 16. Brainard argues that this is additional proof that Liberty always intended to deny him LTD benefits. *Id.*

The Supreme Court has acknowledged that evidence that an insurance administrator has a history of biased claims administration "suggest[s] a higher likelihood that [the conflict of interest] affected the benefits decision." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). However, the fact that Liberty reinstated Brainard's benefits after a period of denial demonstrates that Liberty was willing to make a decision against its own interest, suggesting *un*biased claims administration. Moreover, Liberty's investigation of Brainard's claim after it reinstated his benefits does not prove bias. In fact, the Plan contemplates such investigation by specifically allowing Liberty to require a claimant to be "examined or evaluated at reasonable intervals deemed necessary by Liberty" at its expense. [Adm. Rec., p. 38] The Plan also explains that LTD benefits will cease once the covered person no longer meets the policy's definition of disabled. [Adm. Rec., p. 32] By continuing to investigate his status, Liberty was merely ensuring that Brainard was entitled to coverage under the Plan's terms. For this Court to find that Liberty acted improperly by adhering to the contract at issue would be without basis. Because Brainard has not shown that Liberty's conflict influenced its decision, this Court will not give that factor any significant weight.

### III.

Brainard also claims that Liberty's decision to deny him benefits was not supported by substantial evidence and, therefore, wasarbitrary and capricious. [Record No. 40-1] Specifically, Brainard contends that Liberty improperly ignored the opinions of his treating physicians and instead relied upon its own biased medical reviewers.

In *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), the Supreme Court held that ERISA prevents plan administrators from "arbitrarily refus[ing] to credit a claimant's reliable evidence, including the opinions of a treating physician." However,

unlike decision makers in Social Security appeals, plan administrators are not required to give special weight to a treating physician's opinion. *Id.* Under ERISA's arbitrary and capricious standard, a Court generally will not overturn a plan administrator's decision simply because he or she chose to rely on the medical opinion of one doctor over another. *McDonald*, 347 F.3d at 169. However, the decision to give "greater weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that [the plan administrator] acted arbitrarily and capriciously." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006).

### A. Dr. Chandragiri's Report

In denying Brainard's second appeal, Liberty relied, in part, on the file review conducted by psychiatrist Dr. Sanjay Chandragiri. [Adm. Rec., p. 64] In particular, Liberty depended on Dr. Chandragiri's conclusion that Brainard's medical records do not support a psychiatric diagnosis or demonstrate adverse side effects from prescribed psychotropic drugs. *Id.* Brainard argues that Liberty's reliance on Dr. Charndragiri's file review resulted in an arbitrary and capricious benefits determination. [Record No. 40-1]

The Sixth Circuit has found that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert*, 409 F.3d at 296. However, the decision to request a file review instead of a physical examination, especially where the Plan authorizes an examination, raises questions about the thoroughness and accuracy of the administrator's benefits determination. *Id.* at 295. Reliance on a file review is wholly inappropriate where, as here, an administrator disputes the credibility of a claimant's complaints. *Javery v. Lucent Techs., Inc. Long Term Disability Plan*, 741 F.3d 686, 702 (6th Cir. 2014). File reviews by psychiatrists are viewed

-9-

as particularly suspect since psychiatrists usually treat subjective, instead of objective, symptoms. *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 508 (6th Cir. 2008). *See Javery*, 741 F.3d at 702 ("[F]ile reviews are questionable as a basis for identifying whether an individual is disabled by mental illness.") Thus, the fact that Dr. Chandragiri performed a file review without a consultation or examination, by itself, weighs against Liberty's decision to rely on his report.

Brainard also argues that Dr. Chandragiri unreasonably disregarded the opinions of his treating physicians and did not at all consider Dr. Roebker's psychiatric evaluation. [Record No. 40-1, p. 36] After listing and summarizing the medical records he reviewed, Dr. Chandragiri concluded:

> There are no psychiatric diagnoses supported by medical evidence. The medical evidence does not list psychiatric symptoms in any clarity or detail to make a psychiatric diagnosis. No psychiatric diagnosis has been listed in any of the progress notes. Some symptoms of depression and anxiety are noted in one note, but duration, severity, and type of symptoms are not mentioned and therefore the psychiatric diagnosis cannot be made.

[Adm. Rec., p. 168]

Even though Dr. Chandragiri only recorded two references to depression in his review of Brainard's medical records [Adm. Rec., p. 167], the record is replete with evidence of depression and other symptoms of mental illness. In at least five progress notes over a four-year period, Brainard's primary care physician (Dr. Golden), recorded that Brainard showed signs of depression. [Adm. Rec., pp. 199, 594, 600, 614, and 616] Only five months before Dr. Chandragiri's report, Dr. Golden wrote "depression" in his notes regarding Brainard's medical history. [Adm. Rec., p. 199] Dr. Golden also listed depression on the Restrictions Form he filled-out and sent to Liberty on Brainard's behalf. [Adm. Rec., p. 840]

-10-

On several occasions in 2007 and 2008, Brainard also visited neurologist Dr. P.D. Patel. Dr. Patel's notes reflect that Brainard experienced difficulty sleeping and coping with chronic pain. [Adm. Rec., pp. 706-12] Dr. Patel also wrote "mood disorder" in his notes during several of Brainard's visits. [Adm. Rec., pp. 706-707] Even though Dr. Patel's records were provided to Liberty several months prior to Dr. Chandragiri's report [Adm. Rec., p. 104], Dr. Chandragiri did not include them in the list of medical records he reviewed. [Adm. Rec., p. 166]

Importantly, Dr. Chandragiri also failed to consider Dr. David Roebker's psychiatric evaluation which was submitted to Liberty months before Dr. Chandragiri's report. [Adm. Rec., pp. 104, 166-67] After interviewing Brainard and performing several objective tests, Dr. Roebker diagnosed Brainard with major depressive disorder. [Adm. Rec., p. 273] According to Dr. Roebker, Brainard's psychological disorders adversely affected his ability to concentrate, complete tasks in a timely manner, and endure stressful situations in a workplace setting. [Adm. Rec., p. 274] Consequently, Dr. Roebker concluded that Brainard was "totally and permanently occupationally disabled." *Id.*

In summary, Liberty had no apparent reason to credit Dr. Chandragiri's report over Dr. Roebker's objective findings and personal examination of Brainard. In similar situations, the Sixth Circuit has found the plan administrator's benefits determination to be arbitrary and capricious. For example, in *Cooper*, 486 F.3d at 170, the Court determined that the plan administrator erred by relying on a file reviewer where he only "summarized those parts of the file favorable to [the defendant], omitted the parts that tended to support [the plaintiff's] claim, and concluded that there was insufficient evidence of disability." *See also Calvert*, 409 F.3d at 296-97 (Reliance on file reviewer was misplaced where he failed to review the

whole administrative record and rejected the opinions of the plaintiff's treating physicians out of hand without explanation.); *Javery*, 741 F.3d at 702 ("In particular, we are troubled by the fact that [the file reviewer] overlooked certain evidence in the file and drew adverse conclusions about the 'absence' of such evidence."). In the present case, Brainard is correct that Liberty's reliance on Dr. Chandragiri's opinion regarding his disabling condition was arbitrary and capricious.

Liberty counters that Brainard never mentioned depression in his initial telephone interview with Liberty. [Record No. 42, p. 32] In *Kalish v. Liberty Mutual/Liberty Life Assurance Co.*, 419 F.3d 501, 512 (6th Cir. 2005), Liberty took the same position, arguing that it was not required to consider the plaintiff's claims of depression because he only listed a heart condition on his application for benefits. But the Sixth Circuit concluded,

> such a contention strikes us as illogical in the context of long-term disability benefits. A person who is hospitalized for broken bones received in a fall, for example, may subsequently develop a severe infection. After the broken bones have healed, the person might still be unable to return to work because of the infection, even though the subsequent infection was not listed on the application for benefits. We see no reason that a mental illness triggered by a physical injury should be treated any differently.

*Id.* Thus, as the Sixth Circuit has concluded, a plaintiff's failure to initially list a resulting illness or injury does not excuse a plan administrator from considering it.

Liberty also argues that "there is little, if any, mention in the administrative record that Brainard was treated with any psychotropic medication for depression during the time he received LTD benefits under the Policy." [Record No. 42, p. 32] However, the absence of a particular type of treatment (psychotropic prescriptions, in this case) does not, by itself, undermine the professional opinions of at least two of Brainard's treating physicians.

Next, Liberty relies on the Social Security Administration's rejection of Brainard's claims of depression in support of its conclusion that Brainard was not disabled. *Id.* However, the arbitrary and capricious standard still requires Liberty to reach a reasoned decision based on all of the medical evidence before it. Simply relying on another entity's disability determination is insufficient. Again, Liberty does not explain why the Social Security Administration was correct but Dr. Roebker and Dr. Golden were incorrect.

**B.     Dr. Ballard's Report**

Unlike Dr. Chandragiri, Dr. Ballard conducted a physical examination of Brainard. [Adm. Rec., p. 157] Based on the objective results of her examination and review of the medical records, Dr. Ballard determined that Brainard suffered from degenerative disc disease but was still capable of performing light to moderate physical activity. [Adm. Rec., pp. 158-59] Brainard argues that her seventy-five minute assessment "is insignificant compared to the amount of time [his] treating physicians have spent with him." [Record No. 40-1, p. 33] But in making this argument, Brainard disregards the applicable legal standard. If Dr. Ballard's report represents "substantial evidence," Liberty's decision to rely on it was not arbitrary or capricious. If the weight of an examining doctor's opinion was based on how much time he spent with the claimant, independent medical evaluations would be rendered useless. To adopt such a standard would produce an absurd result and would undermine the deference accorded to administrators under the arbitrary and capricious standard of review.

Brainard also criticizes Dr. Ballard for not explaining why she rejected the opinions of his treating physicians. Generally, a plan administrator must give a reason for summarily rejecting the opinion of a treating physician. *Elliott*, 473 F.3d at 620. However, ERISA does not place a "discrete burden of evaluation [on plan administrators] when they credit reliable

evidence that conflicts with a treating physician's evaluation." *Black & Decker*, 538 U.S. at 834 (footnote omitted). Further, Brainard does not cite any authority that requires an independent medical examiner to give reasons for rejecting a treating physician's opinion. The independent medical examiner's opinion is just that: an opinion. The plan administrator is tasked with weighing the independent medical examiner's opinion against all other medical evidence, including the opinions of treating sources.

Brainard contends that Dr. Ballard based her opinion on the amount of prescription pain medications he was taking at the time, which has since changed. [Record No. 40-1, p. 19] In her report, Dr. Ballard observed that

> [t]he patient takes pain medication occasionally; he does not use it daily. When he takes pain medication, this may cause impairment. This can cause drowsiness and issues with decreased judgment and motor skills. . . . If he is having to use large quantities of pain medication to treat his pain[,] then this could affect his ability to work, but he is not doing that at the present time.

[Adm. Rec., p. 159]

In his letter to Liberty, Dr. Golden confirmed that Brainard was taking very little pain medication at the time of his appointment with Dr. Ballard. [Adm. Rec., p 113] However, Dr. Golden stated that Brainard had gone back to a daily dose of narcotic medication because of a recent pain flare-up. *Id.* Dr. Golden confirmed that Brainard experienced fatigue as well as concentration and memory problems from the pain medications that would prevent him from performing his duties as a branch manager. *Id.* He also expressed that he expected Brainard would "always require some narcotic pain [medications]." *Id.*

After Dr. Ballard's report, Brainard began physical therapy with Linda Spears, PT. [Adm. Rec., p. 115] Her progress notes confirm the statements Dr. Golden made in his letter. Spears recorded that Brainard was taking Dilaudid for pain, and she also observed in

her initial evaluation that Brainard was fatigued after a fifteen-minute examination. [Adm. Rec., pp. 115-16] During at least two other office visits, Spears noted that Brainard was tired. [Adm. Rec., p. 126]

While Dr. Ballard's physical examination lends credibility to her disability determination, she expressly stated that her opinion could change if Brainard was taking more pain medication. Accordingly, Dr. Ballard's report was entitled to significantly less weight once Dr. Golden notified Liberty that Brainard was, in fact, taking more pain medication with side effects that hampered his ability to work.

Spears' objective assessments also conflict with Dr. Ballard's report. Dr. Ballard observed that Brainard had "normal cervical motion." [Adm. Rec., p. 157] Conversely, Spears recorded that Brainard had "very little" range of motion in his spine. [Adm. Rec., p. 117] Dr. Ballard wrote that Brainard scored a five out of five on the manual muscle tests that she administered. [Adm. Rec., p. 158] Spears noted that Brainard had "very weak midscapular [muscles]." [Adm. Rec., p. 117] Not only was Spears a treating source, her observations were also more recent than Dr. Ballard's, further weakening the credibility of Dr. Ballard's findings.

Additionally, none of Liberty's independent medical examiners personally evaluated Brainard for depression. In fact, Dr. Ballard's report does not address Brainard's mental health issues. And while Dr. Golden listed depression as a contributing factor to Brainard's alleged disability, Liberty rejected Brainard's claims of depression. Notably, Liberty did so without the benefit of an examination or consultation to support its determination. As discussed more fully in the context of Dr. Chandragiri's report, Liberty's treatment of

Brainard's mental health issues suggests that its disability determination was arbitrary and capricious.

### C. Dr. Grattan's Report

After Brainard filed a second appeal, Liberty hired Dr. Howard Grattan to perform another file review. [Adm. Rec., p. 67-80] Unlike Drs. Chandragiri and Ballard, Dr. Grattan had the benefit of reviewing Dr. Golden's letter to Liberty and Spears' physical therapy notes. [Adm. Rec., p. 70] He also summarized Dr. Roebker's evaluation. [Adm. Rec., p. 69] While Dr. Grattan diagnosed Brainard with chronic neck pain, headaches, and myofascial syndrome, he also concluded that the records do not contain "any objective evidence" supporting restrictions from July 19, 2013 onward. [Adm. Rec., pp. 77-78] Without further explanation, Dr. Grattan concluded that Brainard's subjective complaints were inconsistent with the physical examination findings and diagnostic studies in the record. [Adm. Rec., p. 78] Dr. Grattan acknowledged Dr. Golden's statements about Brainard's pain and the sedating effects of his medication. *Id.* Nevertheless, Dr. Grattan determined that "no objective limitations or objective slurring or cognitive issues were noted in the medical records, only the claimant's report." *Id.*

The first eleven pages of Dr. Grattan's report outline and summarize Brainard's medical records. [Adm. Rec., pp. 67-77] However, Dr. Grattan's analysis of those records is hardly half a page in length. [Adm. Rec., pp. 77-78] Dr. Grattan's report bears remarkable similarities to a file reviewer's report in *Kalish*, 419 F.3d 501. There, the Sixth Circuit found that Liberty's decision to rely on the file reviewer's report was arbitrary and capricious where the report contained six pages describing the records reviewed but only one page of analysis. *Id.* at 509. According to the *Kalish* Court, "[t]his limited commentary contains

little more than [the file reviewer's] conclusory assertions to the effect that 'the available records do not document a need for restrictions or limitations that would necessarily preclude the employee from performing the duties of his job as described.'" *Id.* Like the file reviewer's report in *Kalish*, Dr. Grattan's report is conclusory and not well reasoned. Moreover, he calls into question Brainard's subjective complaints of pain without the benefit of a physical examination, even though Liberty's LTD plan clearly allows for a physical examination. As discussed above, the Sixth Circuit has held that reliance on a file review under such circumstances is inappropriate. *See Javery*, 741 F.3d at 702; *Calvert*, 409 F.3d at 295.

Finally, like Dr. Ballard, Dr. Grattan does not at all address Brainard's mental health issues. Thus, Liberty relies entirely on Dr. Chandragiri's opinion regarding Brainard's alleged depression. None of Liberty's independent medical reviewers have analyzed Brainard's disability claim in light of Dr. Roebker's objective findings. This fact alone is sufficient to overturn Liberty's denial of benefits.[1]

---

[1] As a post-hoc rationalization for its denial, Liberty points to two other injuries that Brainard sustained during the period that he claims he was disabled. [Record No. 42, pp. 12-13] First, Brainard injured his foot after falling from a tree stand while deer hunting. *Id. See also* Adm. Rec., p. 54. Second, Brainard reported to emergency room staff that he sustained a laceration on his arm while wrestling with his dog. *Id. See also* Adm. Rec., p. 285. Liberty claims that both injuries negate Brainard's disability claims. However, imprudent behavior, even behavior contrary to a doctor's orders, does not, by itself, adversely impact a doctor's diagnosis or automatically disqualify a person for benefits. *Evans*, 434 F.3d at 879 (Where the claimant suffered from debilitating seizures, the Sixth Circuit held that her decision to drive against doctor's orders was not a sufficient reason to disqualify her from receiving LTD benefits.)

## IV.

Having determined that Liberty's disability determination was arbitrary and capricious, the Court must next determine whether to grant Brainard's motion for judgment and award him benefits or remand the matter to the plan administrator for further consideration. A reviewing court may directly award benefits where the plan administrator denied LTD benefits even though the claimant was clearly entitled to them. *Elliott*, 473 F.3d at 622. However, where the problem is merely with the integrity of the plan administrator's decision-making process, remand is generally the appropriate remedy. *Id.*

When Liberty denied Brainard's final appeal, it concluded that he was still able to perform the "material and substantial duties of his occupation as Branch Manager." [Adm. Rec., p. 66] For a covered person to be disabled under the Plan, he or she must also be incapable of the material and substantial duties of *any* occupation with reasonable continuity. [Adm. Rec., p. 8] Liberty has not addressed this issue. Liberty has also failed to fully address Brainard's most recent medical records and his complaints of mental illness. Notwithstanding these failures, Brainard has not proven that he is clearly entitled to benefits under the Plan. As a result, the Court will deny Brainard's motion for judgment and remand to the plan administrator for further review.

## V.

For the foregoing reasons, it is hereby

**ORDERED** as follows:

1. Plaintiff John Brainard's motion for judgment [Record No. 40] is **DENIED**, without prejudice.

2. This case is **REMANDED** to Defendant Liberty Life Assurance Company of Boston with instructions to conduct a full and fair review of Plaintiff John Brainard's claim for benefits consistent with this opinion. The defendant is directed to complete its review within ninety (90) days of this Order.

3. This case is **STRICKEN** from the Court's docket.

4. Each side shall bear his/its costs and expenses incurred in this action.

This 24th day of March, 2016.

Signed By:
*Danny C. Reeves*  DCR
United States District Judge